HENRY E. CRUMLICK *v.* LUCIE J. CRUMLICK.

[No. 16, January Term, 1933.]

*Decided March 21st, 1933.*

382

The cause was argued before Bond, C. J., Urner, Adkins, Offutt, Digges, Parke, and Sloan, JJ.

*William Pepper Constable.* and *John D. Alexander,* with whom was *Lawrence E. Ensor,* on the brief, for the appellant.

*Milton R. Smith,* for the appellee.

Digges, J., delivered the opinion of the Court.

The Circuit Court for Baltimore County, by its decree of June 18th, 1932, granted a divorce to the appellee (wife) from the appellant on the ground of desertion and abandonment, awarded the custody of the three children to the wife, and ordered that the husband pay the sum of $17.50 a week as alimony and for the support of the children. The appeal is by the husband from that decree.

Abandonment, or desertion, as a marital offense, consists in the voluntary separation of one of the married parties from the other, or the refusal to renew suspended cohabitation, wthout justification either in the consent or the wrongful conduct of the other party. *Bishop on Marriage, Divorce and Separation,* vol. 1, secs. 1662, 1663; *Gill v. Gill,* 93 Md. 654, 49 A. 557; *Taylor v. Taylor,* 112 Md. 666, 77 A. 133; *Buckner v. Buckner,* 118 Md. 101, 84 A. 156; *Klein v. Klein,* 146 Md. 27, 125 A. 728. Abandonment and desertion, as a ground for divorce *a mensa et thoro,* must contain two inherent affirmative elements: First, cohabitation ended; and, second, the offending party's intention to desert. *Miller v. Miller,* 153 Md. 213, 138 A. 22; *Crouch v. Crouch,* 150 Md. 608, 133 A. 725; *Sheehan v. Sheehan,* 156 Md. 656, 145 A. 180. It must be the deliberate act of the party against whom the complaint is made, done with the definite intention that the marriage relation shall no longer exist, in so far as it be within the power of the offending party. *Young v. Young,*

136 Md. 84, 110 A. 207; *Fleegle v. Fleegle,* 136 Md. 630, 110 A. 889; *Ruckle v. Ruckle,* 141 Md. 213, 118 A. 472; *Crouch v. Crouch, supra.* Actual separation and the intention to abandon the marital relation must be present at the same time in order to constitute legal desertion. The two need not begin at the same time, but the desertion begins whenever the two coincide in point of time. *Supra.* It is settled in this state that the refusal of the husband or wife to have sexual intercourse with the other, without just cause, constitutes marital desertion. *Fleegle v. Fleegle, supra; Roth v. Roth,* 145 Md. 74, 125 A. 556; *Owings v. Owings,* 148 Md. 124, 128 A. 748; *McKane v. McKane,* 152 Md. 515, 137 A. 288; *Downs v. Downs,* 154 Md. 430, 140 A. 831.

From the cited decisions of this court, it is apparent that the law in this state governing divorce on the ground of abandonment or desertion is fully and firmly established, and is not ordinarily the subject of dispute. The question presented is: Applying the settled law to the facts as disclosed by the record before us, is the appellee entitled to a divorce *a mensa et thoro* from the appellant? The results consequent upon decisions of the courts in many divorce cases are far from satisfactory, when viewed from the standpoint of the future welfare and happiness of the parties directly concerned, or from the broader viewpoint of society as a whole. This being true, there is frequently present the temptation on the part of the chancellor to make the decree in a particular case conform to his individual view of what would be most conducive to the contentment and happiness of the persons directly concerned, or the common welfare.

The policy of this state, as indicated by its statutes and the decisions of this court, is based upon the firm belief that the interests of its citizens, collectively and individually, are best subserved by maintaining the home as the most advantageous environment under which future citizens may be reared; to prevent the disintegration of that home and the separation of the marital parties for trivial or inconsequential reasons, and to compel that no divorce be granted except for serious and weighty causes firmly established and under-

384

stood. There is a modern school of thought, including in its members people of great refinement, unquestioned integrity, and the highest educational advantages, which contends that a policy different than the one adopted and adhered to in this state is the correct one, more particularly as applied to married couples whose union has not resulted in the production of offspring. If there should be and is to be a change of policy on this subject, it is a legislative and not a judicial function. The courts are bound only to pass divorce decrees when the evidence produced establishes a legally recognized cause.

Abandonment and desertion being a cause for divorce in this state, the question in the case now before us is: Did the acts, declarations, and conduct of the appellant, as disclosed by the record, constitute abandonment by him of his wife? As would be expected, the testimony of the husband and wife is not in accord as to some of the facts. Those which are undisputed or which are shown to be true to our satisfaction are: That the husband was with the American Army in France during the World War, at which time he became acquainted with the wife, the daughter of a retired French Army officer living at Angers, France; that after the armistice the husband returned to America and corresponded with the wife, during which correspondence he proposed marriage. Upon the wife's suggestion he went back to France in February, 1921, remaining there until the time of their marriage on April 6th, 1921. Shortly after the marriage the couple returned to America and took up their residence at Dundalk, Maryland, at first for a very short time with a sister of the husband, and later in the home belonging to the husband. The record discloses that they lived the normal married life until May, 1929, before which time there had been born to them three daughters. In May, 1929, without any apparently sufficient cause, sexual intercourse between them ceased. Neither of the parties give any explanation for that cessation. The husband's business at the time of the marriage was conducting a news stand at Dundalk, and later engaging in the coal and ice business,

conducting a restaurant and a hotel or boarding house, as also several miniature golf courses. Up to about the time of the beginning of the general economic depression, his business was reasonably successful, and he provided for the support and maintenance of his wife and children in accordance with his means; and was an affectionate and kind father. From the record it appears that the education and culture of the wife and her parents is above that of the husband; that the wife's parents came to this country about July or August, 1921, and lived with their daughter in the husband's home for some months, during which time friction appeared between them and the husband; that at the husband's request they left his house and went to live on Patapsco Avenue in Dundalk until some time in 1924, when they returned to France; that the husband visited his wife's parents' house on Patapsco Avenue once during their residence there; that they frequently visited their daughter, on which visits they would sometimes speak to the husband, and sometimes not; that in the summer of 1928 the wife's parents returned to America and lived at the couple's home until the following October or November, at which time they put up $1,500 and entered into a partnership with the husband in the conduct of the hotel known as the Beth Mary Inn, and moved to that establishment as managers, remaining there for about six months (according to the wife eighteen months); that they were not successful in the management of the hotel, and moved back to the home of their daughter and her husband; that again, at the request of the husband, they left his home and returned to France, remaining there until September, 1931, at which time they came to America and again took up their residence with the daughter and her husband, upon the invitation of the daughter, acquiesced in by the husband; the husband's version of this consent being that the wife promised to renew marital relations; that during the period the parents were living in France, the wife and children visited them, with the sanction and approval of the husband and at his expense. That on December 5th, 1931, the hus-

band left the common domicile, taking his personal clothing, and telling the wife he was going to live at Beth Mary Inn until her parents left; that subsequently, on December 19th, the husband arranged a meeting at the office of Mr. Constable, looking to a reconciliation, at which were present the husband and wife and their respective counsel. The record is silent as to any definite agreement or understanding as a result of this meeting, but the facts are that the wife returned to the home, where later (about 8 o'clock in the evening) the husband appeared, stating that he was coming back to stay at home, and asked the wife to resume living with him as husband and wife.. This she refused, and left the home with her parents, taking the children; since which time the wife and children have continued to live with her parents. Four days later the wife filed the original bill in this case for divorce. On December 24th, before the husband had any notice of the filing of a divorce action, the witness Mansberger, a friend of the husband, passing the Crumlick home and finding the husband there alone, after finding out that the separation had taken place, volunteered to call upon the wife and endeavor to induce her to return. This he did, but was unsuccessful, the wife telling him: "No, there is no use to talk to me; my mind is made up; I will not go back with Mr. Crumlick; no, I am through; I am through with him, and you can go back and tell him what I say." It is also shown, according to the wife's testimony, that she had talked with her husband about a divorce.

Disregarding the lack of corroboration of much of the wife's testimony, the record in our opinion does not present a case which entitles her to a divorce. There is no desertion by him shown growing out of the suspension of the marital relation, which seems to have been without a sufficient cause, and practically by mutual consent. If we assume that it was the husband's act which brought about suspended cohabitation, there is no evidence of the slightest effort on the part of the wife to have it renewed; but on the contrary, all the evidence on that point indicates that the husband was anxious for a renewal of cohabitation. The husband did actually leave

the common domicile on December 5th, 1931, and take up his abode at the hotel of which he was the owner and manager, telling the wife where he was going and that he would remain there until the parents left his home. This is not denied, but in effect is corroborated by the wife. It is further corroborated by the husband's action in securing the meeting at Mr. Constable's office in an effort to bring about a satisfactory arrangement by which they would continue living together, and his going to the home after that meeting, at which time she took the children and left with her parents. Again, the intention on the part of the husband to desert his wife is refuted by the action of his friend Mansberger, at the solicitation of the husband, in attempting to induce the wife to return, and this at a time when it cannot possibly be said to have been actuated by a purpose to build up either an affirmative or defensive case for himself. These overtures were met by positive and unequivocal refusal on the part of the wife to return, and a declaration by her that the witness so inform her husband.

The bill of complaint also charges cruelty, but the plaintiff's evidence on this point, according to the view of the chancellor, lacks corroboration and is too indefinite and inconclusive to constitute a foundation for a decree. In this finding we concur.

After the husband answered the wife's original bill and filed his cross-bill asking for divorce *a mensa et thoro* on the ground of abandonment and desertion, the wife filed a supplemental bill praying for an absolute divorce on the ground of adultery. There is no evidence in the record in respect to this charge; and the supplemental bill was properly dismissed.

We come now to the question of whether or not the husband is entitled to a divorce; and we are of the opinion that under the circumstances of this case the action of the wife in leaving home under the conditions here shown, with the belief that she had a legal ground for divorce against her husband, as shown by the filing of her bill four days after her leaving, does not constitute desertion by her.

388

Our conclusion is that neither of the parties is entitled to the relief prayed. That part of the decree of the chancellor awarding the wife a divorce and alimony must be reversed. So much of the decree as awards the custody of the infant children to Lucie J. Crumlick, the mother, is affirmed, reserving to the chancellor the power and authority to pass any future order or decree, both as to the custody and guardianship of the children, and requiring the appellant to provide for their support and maintenance.

*Decree affirmed in part, and reversed in part, and case remanded, the appellant to pay the costs above and below.*